[Civ. No. 11981. Second Appellate District, Division One.—November 6, 1940.]

ALLEN MOORE et al., Plaintiffs; UNION MARINE AND GENERAL INSURANCE COMPANY (a Corporation), Respondent, v. J. L. NORWOOD, Appellant.

360

C. F. Jorz for Appellant.

Tripp, Penney & Callaway and D: Paul White for Respondent.

WHITE, J.—In an action for damages arising out of an automobile accident a verdict was rendered in favor of

plaintiffs, and from the judgment entered on such verdict defendant prosecutes this appeal. Pursuant to stipulation and motion, an order was entered herein dismissing the appeal as to the plaintiff and respondent Allen Moore, who was injured in the accident, and the only portion of the judgment now under attack is that in favor of Union Marine and General Insurance Company, which paid for the cost of repairs to the truck owned by plaintiffs Moore and Badley.

From the evidence adduced at the trial, it appears that on April 24, 1937, on a public highway between the cities of Lordsburg and Douglas in the state of Arizona, a 1935 Dodge two-ton truck owned by plaintiffs Allen Moore and Russell Badley was being driven in a westerly direction by Bert Acevedo, an employee of Moore, who also was riding in the truck at the time of the accident. The accident occurred at about 3 o'clock in the afternoon on the open highway, which at this point was paved with concrete 18 feet wide. On either side of the road was a dirt shoulder four feet wide. At the scene of the accident two highway repair trucks were parked on the north half of the concrete strip, facing east, each with its left-hand wheels on the north edge of the pavement. These trucks were seven feet wide. A flag warning marker had been placed in the center of the north half of the road about 200 feet east of the highway repair trucks. The plaintiffs' truck passed to the left of the flag marker and continued on its course straddling the white center line. As the truck was passing the flag, or immediately after it had passed, appellant, J. L. Norwood, driving a Ford sedan, attempted to overtake and pass the truck. In this effort appellant, when first seen by Mr. Moore, was partly on the shoulder and partly on the pavement, "wobbling and zigzagging", apparently experiencing some difficulty in steering the automobile. Appellant's automobile, however, passed the truck and returned to the paved portion of the highway in front of the Moore truck. When the latter reached a point about 35 or 40 feet distant from the parked highway repair trucks, Moore yelled to his driver to "miss those trucks". However, although plaintiffs' driver testified he applied the brakes and turned right, the respective left front fenders of the Moore truck and the highway repair trucks contacted, and the Moore truck left the paved portion of the highway and traversed a field abutting the highway for

a distance of 125 feet and then upset. Appellant's automobile continued westerly and stopped at a point some 200 feet beyond or to the west of the highway repair trucks.

At the trial it was plaintiffs' theory that defendant's automobile swerved from the shoulder of the road alongside the Moore truck to a position directly in front of it, by reason whereof it was prudent and necessary in order to avoid impact that the truck driver turn to the right, and that consequently the sole proximate cause of the accident was the negligent driving of the defendant. The only ground urged for reversal upon this appeal is that the trial court committed prejudicial error by admitting in evidence certain testimony embracing the opinions of two witnesses assertedly qualified as experts.

At the trial R. L. Kirk, an eye-witness to the accident, was sworn, and testified that he had resided in the state of Arizona 22 years; was employed by the Arizona state highway department; that prior to that time he had served as a soldier in the Spanish-American war, the Philippine insurrection and the first world war; that during his service in the last-named war he was assigned to military police duty in connection with which he had had occasion to and was required to investigate accidents. He also testified that over a long experience as a peace officer his duties consisted of investigating automobile accidents. Over objection of defendant, plaintiffs were permitted to ask this witness the following questions, to which he gave answers favorable to the latter:

"Q. Now, Mr. Kirk, based upon your experience in investigating accidents, would you say that at the point where the Norwood car passed in front of the Moore truck, that if the Moore car had not veered over to the right, he could have avoided striking the Norwood car in front of him?

"Q. Now, at the rate of speed that you observed the Moore truck, was it possible at the angle at which the Norwood truck passed in front of it, for the Moore car to have avoided him?

"Q. Mr. Kirk, in other words, what I am asking you now —you have already answered the first question, that if he had continued in a straight line he could not have avoided striking the Norwood car in front of him.

"Q. When I asked you, was it possible in the distance that intervened between the Moore car and your car, where the Norwood car passed in front of it, to have remained on the highway?

"Q. You testified, Mr. Kirk, that there was 35 feet between the Moore car and your car when the Norwood car passed in front of it; is that correct? A. Correct.

"Q. Now, at the rate of speed that you observed the Moore car traveled veering off to the right, as you testified it did, in your opinion was it possible, under the circumstances, for the Moore truck to have remained on the north side of the road without running into the parked highway truck? . . . A. No.

"Q. . . . Mr. Kirk, had Mr. Norwood proceeded along in the direction in which he was proceeding just before he made a turn to the right, could the Moore truck have passed between the State Highway trucks and the Norwood car? A. Yes."

Another witness, Ethelbert Favary, was called and testified that he was a consulting automotive engineer, in connection with which profession he had years of experience with Richfield Oil Company, Moreland Motor Truck Company, had written books on motor vehicle engineering, and served in a technical capacity on an advisory committee on motor vehicle legislation in the State of California; and further, that he had appeared as an expert before the Interstate Commerce Commission and the California Railroad Commission in matters affecting motor vehicle transportation. After testifying without objection that an automobile or truck going 35 miles per hour would travel 51 feet per second, the witness, over objection of defendant, was asked and permitted to answer the following questions:

"Q. Now, Mr. Favary, from your experience, when a person sees an object suddenly loom in front of him, have you made any tests, or are you familiar with any official tests, to determine the time of reaction of the driver in operating his automobile? A. I am familiar with the test and have made some myself."

Following objection on the ground that the question called for expert medical testimony, the witness was permitted to state that there had been official tests made, not of a medical type, but rather automotive tests, to determine what is called

"coordination" or "time reaction", in the course of which he testified as follows:

"I refer to a driven automobile. When a driver sits in the front of an automobile and all of a sudden he sees an object or obstruction in front of him, he will naturally turn or try to get out of the way of that obstruction. It takes some time from the time that he sees that object before he allows his muscle to take hold of the wheel or brake, as the case may be, and apply action. I mean, in respect to the brake, he goes about half a second in time, after he sees the object, before he can apply the brake. In steering to one side—that is what I believe you refer to—it would take him one-fifth of a second on an average, varies from about .18 to .25 of a second, before, from the moment he perceives the object, he is ready to do something, and then he takes about another quarter of a second before he actually does. We usually figure the average reaction time as one-half second."

Then followed the question, "We are talking about a sudden emergency. Then it would be half a second before a man, as I understand it, would have an opportunity to change his course, just merely a matter of mathematics—51 feet a second—would be 25.5 feet in half a second", to which the witness answered, "About."

Thereupon plaintiffs' counsel propounded the following question:

"Now, Mr. Favary, assuming that a truck was straddling the white line in the middle of that road, and going, we will say, about 35 to 40 miles an hour, and that there was a parked highway truck 35 to 40 feet in front of this truck, headed the opposite direction, and that that truck was either 6 or 7 feet in width from fender to fender, parked with the left wheels on the outer edge of the pavement; that would be the north side here. Could a driver within that time have turned or maneuvered the truck so as to have avoided coming in contact with that parked truck on the highway? A. Well, by turning or continuing to turn in the right direction here, that is the only thing he could have done to avoid it. Now—"

Then followed these interrogatories:

"Q. Ten to fifteen feet to maneuver the truck. Now, could the driver have maneuvered the truck so as to have

avoided that highway truck in the position in which you have it headed? A. All the truck could have done was to continue going. There was no room to do anything else. If it is going 35 miles an hour, you can't make a sharp turn either to the right or left.

"Q. What would have happened if he had made a sharp turn? A. He would have been liable to turn over. In fact, the centrifugal force at 35 miles an hour is considerably greater than the force of adhesion between the tires and the ground. Therefore it would just slide sideways. I think every automobile driver knows what happens when he tries to make too sharp a turn going that fast.

"Q. In other words, he could not have kept the road under those circumstances which I have propounded to you in that hypothetical question? A. He could not have done anything but continue in this direction because he could not turn in less than 150 diameter, 150 yards.

"Q. In that 40 feet he could not have turned and kept his truck on the road; that is the point we want to get. A. Well, no, he could not, if he is in this position, within 15 feet of this object, he could not turn and go back to the road.

"Q. When you say, 'go back to the road', you mean he could not turn to the left? A. He could not turn to the left; you said whether he could stay on the road.

"Q. When he is headed in this direction, within 15 feet, you say he could not have turned to the left? A. No.

"Q. Make a sharp turn without turning over? A. No.

. . . . . . . . . . . . .

"Q. Mr. Favary, if the plaintiff's truck had been traveling, as you indicated on the diagram, straddling the center line of the 18-foot paved highway, and within 35 to 40 feet of the paved highway truck [sic] on the north side of the road, with its left wheels on the north edge of the pavement, assumed to be 7 feet in width, and a truck or an automobile suddenly loomed in front of the plaintiff's truck, causing him to turn to the right, could the plaintiff's truck have turned to the left and avoided striking the parked highway truck on the right? . . . The Witness: I cannot answer this question unless we go by the figures and the dimensions that have been furnished me here; in other words, if this truck was within 15 feet of this truck, with the steering gear partly

turned in this direction, then he could not have gone back to the left.

. . . . . . . . . . . . . . .

"Q. Under those circumstances, and taking into consideration the position of the trucks and all the other facts I have given you in the hypothetical question, was there anything the driver could have done to have avoided running off the road? . . . The Witness: There is nothing the driver could have done over here except to go in this direction. He was too close to stop the car, from here to here."

█ It is the law that upon a trial facts may be proved by opinion evidence when the ultimate question is one of science, art or trade upon the subject of which the witness is skilled (Code Civ. Proc., sec. 1870, subd. 9); but opinion evidence is never admissible upon a subject which is capable of direct proof and when the ultimate question can be otherwise ascertained and made intelligible to the trier of fact.
█ In other words, whenever the question to be determined is the result of the common experience of all people of ordinary education, or such result is to be inferred from particular facts, such inference must be drawn by the jury and not by the witness. █ Except in the instances provided in subdivision 9 of section 1870 of the Code of Civil Procedure, the general rule is that witnesses must testify to facts and not to opinions. (*Sappenfield* v. *Main St. R. R. Co.*, 91 Cal. 48, 59 [27 Pac. 590].) █ Whether, when at the point where the defendant's automobile passed in front of the Moore truck, the accident could have been avoided if the Moore truck had not veered over to the right; whether under the circumstances it was possible for the Moore truck to have remained on the north side of the road without running into the parked highway repair trucks; whether, had defendant proceeded along in the direction he was going just before he made a turn to the right, the Moore truck could or could not have passed between the highway repair trucks and the defendant's car; whether there was anything the driver of the Moore truck could have reasonably done to have avoided running off the road; and whether such truck could have been turned to the left and thereby avoided striking the parked highway trucks on the right, were all issues in the case for the jury to determine from the factual circumstances that might be shown. No special training or ex-

perience was required to determine the aforesaid questions. Based upon the facts which supported the opinion of the expert witnesses, the jury could just as readily and correctly have drawn the conclusions as could the witnesses; and it was error to permit the opinions of the witnesses to be substituted for those of the jury and to allow, as the court did by instructions, a verdict to be based upon the opinions of these witnesses. The answers to the foregoing questions called for the very conclusions that the jury were to pass upon and invaded as well as usurped the province of the latter. The questions as to whether both plaintiff and defendant drivers used prudent and proper care, caution and judgment in the operation of their respective motor vehicles were for the determination of the jury from all the evidence. These were not questions upon which the opinions of expert witnesses were allowable. The jury were called to pass upon the question of negligence on the part of the drivers of both vehicles, and there was no need for the opinion evidence given by the expert witnesses. It clearly trenched upon the province of the jury because it permitted the witnesses to decide the very questions upon which the jury alone is competent to pass judgment. (*Carty* v. *Boeseke-Dawe Co.*, 2 Cal. App. 646, 649 [84 Pac. 267]; *Holroyd* v. *Gray Taxi Co.*. 39 Cal. App. 693 [179 Pac. 709]; *Eaton* v. *Southern Pac. Co.*, 22 Cal. App. 461, 474 [134 Pac. 801]; *Fishman* v. *Silva*, 116 Cal. App. 1, 8 [2 Pac. (2d) 473]; *Wilkerson* v. *El Monte*, 17 Cal. App. (2d) 615 [62 Pac. (2d) 790].)

It was clearly error to permit the witness Favary to answer questions of which the following are examples:

"Q. Now, Mr. Favary, from your experience, when a person sees an object suddenly loom in front of him, have you made any tests, or are you familiar with any official tests, to determine the time of reaction of the driver in operating his automobile?

"Q. Is there a certain coordination within which a driver —coordination of mind, of course, and body, in what he does in a situation of that kind?"

As was said in *Fishman* v. *Silva, supra*, "The questions under investigation were not the subject of expert testimony, as it is obvious that no expert outside of the so-called psychiatrist can even venture an opinion as to what two different

people might do in the management of a car in an emergency.''

We cannot agree with respondent in its claim that the expert testimony in question served only to clarify before the jury the mental picture painted by the expert witness Kirk from the factual situation to which he as an eye-witness testified, because this witness, as well as the witness Favary, was permitted to answer for the jury the question of whether respondent driver was or was not negligent in running off the road. In thus allowing the jury to be influenced upon questions of which they were the sole arbiters, appellant was deprived of his right to have the jury render its verdict upon the facts of the case; and to that extent the judgment of the so-called experts as to the prudence, caution and care or the lack thereof on the part of the truck driver was substituted for what should have been the judgment of the jury. Manifestly such so-called expert testimony might or could have considerable weight with the jury, or possibly some members thereof, and would have a tendency to overcome any doubt they might entertain as to the ultimate question of negligence in the conduct of respondent's driver. That such result would ensue is immediately suggested by the following instructions given to the jury at respondent's request: ''The purpose of the introduction of the opinions of experts as evidence, is to supplement the general knowledge and experience of the jury in relation to matters before the jury, and thereby to aid the jury in the exercise of their own judgment, to the end that a more just and accurate conclusion may be drawn from the evidence.'' We entertain no doubt that in giving to the jury this inadmissible evidence as a ground for their verdict appellant was prejudiced in his substantial rights to a trial by jury. The result might easily have been different had the objectionable testimony been excluded. Therefore the saving grace of section 4½ of article VI of the Constitution and section 475 of the Code of Civil Procedure cannot be put in operation to save the judgment.

We find no merit in respondent's contention that seasonable and appropriate objections were not made to the challenged evidence at the trial. As stated in 64 Corpus Juris, page 179, section 201, ''Where an objection to evidence is distinctly made and overruled it need not be re-

peated to the same class of evidence subsequently received, although the evidence is given by or the question asked of, another witness.'' ██ Neither does the fact that appellant cross-examined respondents' expert witnesses deprive the former of the benefit of his objections made at the trial, nor does such action militate against him on appeal. The rule in this regard is thus succinctly stated in *Jameson* v. *Tully*, 178 Cal. 380, 384 [173 Pac. 577]:

''By the presentation on his own part of such independent proofs the objecting party, of course, waives his objection and point on appeal; not so, however, when the objecting party undertakes to exercise his right to cross-examine a witness as to statements to which he has erroneously been permitted to testify. Were it otherwise, one of the main functions of cross-examination would be most seriously impaired; for a party after rightfully objecting to the admission of evidence, may by his cross-examination lay the foundation for an obviously proper motion to strike it out, or may compel its contradiction or withdrawal, or may utterly destroy its effect, and thus render unnecessary his remedy by appeal from the court's erroneous action.''

For the foregoing reasons, that part of the judgment from which this appeal was taken is reversed and the cause remanded for a new trial thereon.

York, P. J., and Doran, J., concurred.