[Civ. No. 4993.   Fourth Dist.   Apr. 27, 1956.]

LUCIEN F. ROSS, Appellant, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Respondents.

Quill & Shelton and Arthur M. Shelton, Jr., for Appellant.

Robert A. Walker, Richard K. Knowlton, John A. Willey, Hansen, McCormick, Barstow & Sheppard, Maurice E. Smith and Harold V. Thompson for Respondents.

GRIFFIN, J.—This is an action by plaintiff and appellant to recover damages for personal injuries suffered in a collision of his car with a train operated by defendant and respondent Atchison, Topeka and Santa Fe Railway Company

(hereinafter referred to as Santa Fe), occurring where the main line of the Santa Fe between Fresno and Bakersfield crosses a secondary highway just west of Selma, which highway is maintained by defendant and appellant county of Fresno (hereinafter referred to as the County).

A former trial by jury resulted in a verdict for plaintiff in the sum of $150,000, before another judge, who granted defendants' motion for a new trial on the ground of insufficiency of the evidence. The appeal comes to this court after a second jury trial of the action before another judge, and after a motion by defendants for a directed verdict in their favor was denied resulting in no verdict for either party. After the jury was discharged each defendant moved for a directed verdict under section 630 of the Code of Civil Procedure. The court, after hearing argument, ordered that each defendant have judgment in accordance with its motion for a directed verdict.

The main question before us is whether there is any evidence of sufficient substantiality to support a verdict in favor of plaintiff and, if so, whether there was a failure of plaintiff to exercise the care required of a reasonably prudent person which was a proximate cause of the accident.

In discussing the evidence, therefore, we are bound by the time-honored rule respecting nonsuits and must take the evidence and the reasonable inferences therefrom strongest in favor of plaintiff. (*Crawford* v. *Southern Pac. Co.*, 3 Cal. 2d 427 [45 P.2d 183].)   A motion made under section 630, *supra*, is properly granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference, there is no evidence of sufficient substantiality to support a verdict for plaintiff. If the evidence is such that fairminded men might honestly draw different conclusions as to the existence of negligence on the part of defendants and of contributory negligence on the part of plaintiff, the question is not one of law but one of fact. (*Carpenter* v. *Atchison, T. & S. F. Ry. Co.*, 109 Cal.App.2d 18 [240 P.2d 5].) In determining these questions the court in *Green* v. *Key System Transit Lines*, 116 Cal.App.2d 512 [253 P.2d 780], has given expression to the old rule announced by Mr. Justice Holmes as to the duty of a vehicle driver approaching a railroad crossing to "stop, look and listen," as held in *Baltimore & Ohio Ry. Co.* v. *Goodman*, 275 U.S. 66 [48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645], and followed in *Griffin* v.

*San Pedro, L. A. & S. L. R. Co.,* 170 Cal. 772 [151 P. 282, L.R.A. 1916A 842], and which relates that there is a softening of that rule by more modern decisions. It is there stated that:

"A fair summation of the present rule with reference to the duty of a vehicle driver approaching a railroad crossing is that he is not necessarily required to stop. He is required to look. However, he does not necessarily have to look from the best possible available spot as long as the spot selected gives him a reasonably assuring view of the track. ... Nor does the fact that his view down the track in the direction from which the train eventually appears, is somewhat obstructed, make him necessarily guilty of contributory negligence as a matter of law."

Our Supreme Court, in 1952 (*Conner* v. *Southern Pac. Co.,* 38 Cal.2d 633, 636 [241 P.2d 535], approved an instruction describing this duty of care as follows:

"A traveler approaching a railway crossing with the intent of crossing thereover on a public highway is required, if he does not stop, to approach the tracks with his vehicle under control so as not to render ineffective other precautions required of him, such as looking and listening for the approach of a train, and so that he may be able to stop or turn aside while still in a position of safety upon ascertaining that a train is approaching which might endanger his passage over said track."

In *Hildebrand* v. *Atchison, T. & S. F. Ry. Co.,* 44 Cal.2d 196 [281 P.2d 249], it is held:

"Ordinarily it is not negligence as a matter of law for motorist to drive at such speed that he cannot stop within range of his vision, but it is a factual question; and in action by motorcyclist for injuries resulting from collision of motorcycle with locomotive at crossing, motorcyclist is not guilty of contributory negligence as matter of law where evidence does not disclose facts which would compel conclusion that his speed was excessive or that he was negligent in failing to discover presence of train sooner than he did or in failing to stop after seeing train in time to avoid accident."

With these authorities in mind we will review the facts. Nebraska Avenue (near the settlement of Monmouth) is an oiled, two-lane secondary road running in a general east-west direction, on which plaintiff was driving in a one-half ton Dodge pickup truck on February 1, 1953, at about 11:55 a. m. It intersects defendant Santa Fe's single track right-of-way which runs generally in a north-south direction. At

this intersection, on the northeast and southwest corners were erected the Standard (No. 1) "post and cross-arm" railroad crossing signs. The rise of the rail bed was about 2 feet above the level of the approaching highway. As one approaches the intersection from the east one's view of a train approaching from the north is obstructed to some extent by the presence of a large industrial structure, including tanks, vats and meshed wire fencing sitting back on the acreage near the northeast corner of the intersection. There is testimony that as one approaches the intersection within about 600 feet from it, the first unobstructed view of the track to the north is about 105 feet from the crossing. A grape vineyard occupies the property southeast of the intersection and somewhat obliterates the view of the rail-bed in that direction. The last 100 feet or so of Nebraska Avenue, as it approaches the tracks, had been covered with a loose oil and gravel substance obliterating the white center line for that distance. No "RXR" sign had been painted on the highway approaching the crossing. There was testimony that Chesnut Avenue intersects Nebraska Avenue about 1,125 feet east of the railroad tracks and along that road from Chesnut Avenue to a point about 600 feet east of the crossing, an approaching southbound train would be visible to a westbound vehicle driver, and that about 400 feet east of the intersection was posted an "advance warning sign" described in a stipulation in the record as "a white one with black cross-arms" reading "RXR," containing many artificial reflector lights, and *that it was in place on the date of the accident,* on the north side of Nebraska Avenue facing east. ■ During the trial counsel for plaintiff asked to be relieved of this stipulation made in the former trial because he now believed he had some evidence such a sign was not in place at that particular time. No fraud and no sufficient facts were shown to require such relief. The trial court did not abuse its discretion in denying the request. (*Gonzales* v. *Pacific Greyhound Lines,* 34 Cal.2d 749 [214 P.2d 809]; *Webster* v. *Webster,* 216 Cal. 485 [14 P.2d 522]; *Sinnock* v. *Young,* 61 Cal.App.2d 130 [142 P.2d 85].) The "RXR" was painted on a round plate about 24 inches in diameter and erected on a post about 5 feet above the ground. The freight train consisted of 86 cars and a Diesel engine carrying two units. It was traveling in a southerly direction at a speed of between 40 and 45 miles per hour. As the engine passed over the intersection, plaintiff's truck struck the front

portion of the first unit back of the Diesel engine (which was about 58 feet from the front of the engine) throwing the engine of the truck back into its seat and resulting in serious injuries to the plaintiff.

The testimony of the witnesses may be summarized as follows: Plaintiff testified he had been employed in that vicinity for more than two weeks and had crossed this intersection on another or other occasions during that period; that he was proceeding westerly on Nebraska Avenue at about 40 to 45 miles per hour; that previously it had been foggy in spots but the fog was lifting and clearing when he reached Selma; that he did not remember any fog "going out that way . . . it might have been a little haze or something . . ."; that he could see "four or five miles down the road"; that he did not see the "advance warning sign," did not hear any bell or whistle from the train, and did not notice the tracks or railroad right of way ahead of him or anything else until about 150 or 100 feet from the tracks, when he first saw the engine of the approaching train to his right; and that he immediately applied his brakes and it was then he first noticed the cross-arm railroad crossing sign, and in a few seconds his truck struck the train as heretofore indicated. Plaintiff was removed to the hospital.

A witness, Janzen, was approaching the same intersection in his car on Nebraska Avenue some distance behind plaintiff's truck. He testified he did not see the accident but did see the box cars and as "he remembered it" he heard no whistle of a locomotive; that upon arriving at the scene he made observations of conditions and summoned aid and identified certain photographs which were in evidence. On cross-examination he testified he did not remember whether he had his car radio on at the time, did not know if the car windows were up or down, and did not remember whether he was engaged in conversation with other passengers just prior to seeing the box cars in the intersection; that he did not remember how far east of the crossing he was when he noticed them; that he was traveling between 55 and 60 miles per hour; that the visibility was good and there was no fog; that he did not see the Diesel engine pass the intersection and did not notice the "advance warning sign"; and that by the time he reached the tracks the railroad man from the caboose, which had passed the intersection, was there at the scene. In his deposition he testified: "We were talking . . . probably" and the car "windows were up" and that plaintiff asked at the time

"Which part of the train did I hit? . . . Why didn't I see it?"

The brakeman, called as an adverse witness, testified he was seated in the brakeman's seat between the fireman and the engineer; that the fireman, who was seated on the left-hand side of the train, had stepped back into the motor room to inspect the motors; that the operating rules of the Santa Fe were that a lookout must be kept on the left side of the train at all times; that he did not move into that seat; that the first time he saw the truck was when they were approaching the crossing; that he looked to his left, out of the window, and saw the truck approaching at about the same speed as the train was traveling and it looked as though plaintiff was going to stop; that later he looked again after the engine passed the intersection to see if the truck stopped but it did not do so; and that there was no fog but a little haze at a far distance. However, in a previous statement he said it was "pretty foggy . . . it was not so foggy you couldn't see . . . see a block and a half or two blocks maybe." He then stated that before the approach to the intersection the whistle on the engine blew "two longs—a short and a long blast, and the bell was ringing."

The engineer testified that they had been in the fog prior to the accident but at this particular time the sun was shining. His report, received in evidence, indicated: "Kind of weather: Fog." He testified that from the train, as it approaches this intersection from the north, the view of approaching vehicles on Nebraska Avenue for about 200 feet, is obstructed by reason of the buildings on the northeast corner until about 200 or 300 feet before reaching the intersection and then one can see east on Nebraska Avenue; that before reaching the buildings there is an unobstructed view of an approaching vehicle across the field toward Nebraska Avenue to the east; that the headlight of the engine was burning at the time, the bell was ringing, and the whistle was blown just prior to the approach to the crossing; that he started the first blast at the whistling post which was about 2,000 feet from the intersection, and the last blast was prolonged until the engine passed across the intersection; that in the Diesel type engine the operator sits up in front and looks through a windshield like the one on a truck; that the train was traveling about 45 miles per hour and he brought it to a stop in about 4,000 feet, and the caboose was about 50 feet south of the crossing.

The fireman testified it was his duty to maintain a lookout from his position in the engine when he was in the cab, but at other times the brakeman often would take his place, but he knew of no rule requiring it; that he was not in his seat at the time of the accident but was back inspecting the engines; and that when the train stopped the weather was clear although he signed a report that it was "Foggy."

A member of the county board of supervisors of that district and the county road commissioner were called as plaintiff's witnesses under section 2055 of the Code of Civil Procedure. The supervisor testified generally that he was familiar with the actual general conditions of the intersection as they existed at the time; that different people had spoken to him about that interesection, and this subject was discussed at a board meeting, but he did not know if any official action had been taken. It appears that the board would not act finally on such matters until they were first referred to the road commissioner for recommendation. The road commissioner testified it was his duty to inspect the roads in the county to see if they had, at least, the minimum requirements of protection to the traveling public required by law; that the symbol "RXR" was not painted on the easterly approach to the railway crossing at this intersection because the county had just completed some work on the pavement and had widened the road crossing, but he believed there never was such a sign on the pavement prior to this time; that two stop signs had been previously erected on Nebraska Avenue between the Selma intersection and the highway crossing and by resolution of the board white "Stop Ahead" signs had been painted on the highway at those places.

The assistant division engineer of the Santa Fe, called as an adverse witness, testified that he had supervision of track maintenance and construction and that he inspected railroad crossings; that reports were made to the company; that the company has an inspection committee consisting of a representative of the Public Utilities Commission, an officer of the particular city or county, and an engineer of the Santa Fe; that he participated as a member of that committee and it made an inspection of the crossing in 1947; that in conjunction with a statewide railroad crossing survey of the Santa Fe tracks in that year a report was rendered and among the recommended work to be done was a notation: "Install two No. 8 flashing lights" at an estimated cost of $4,000, and that the county paint an "RR Crossing" sign and stripes on pavement and install two reflectorized advance warning signs.

A similar report, dated in 1950, was offered. It was entitled: "Resurvey of Grade Crossings," which made a similar recommendation but suggested that the Santa Fe and county each pay one-half of the cost of flashing lights. The court rejected the offer in evidence of these documents, together with certain work sheets of the company. Plaintiff claims error in this ruling. It appears that these documents were only recommendations or opinions of the company's appointed committee in 1947 and 1950, and were not orders of the Public Utilities Commission, and would not necessarily show any violation of an order of such commission or that it would be negligent for the company to utilize the railroad crossing with the present warning signs. This was a long range improvement program and there was nothing in the report indicating any priority or emergency as to this particular intersection. Upon the showing made, no prejudicial error appears. (*Moore* v. *Norwood*, 41 Cal.App.2d 359 [106 P.2d 939]; *Wilkerson* v. *City of El Monte*, 17 Cal.App.2d 615 [62 P.2d 790]; *Johnson* v. *County of Fresno*, 67 Cal.App.2d 116 [153 P.2d 557].)

There was received in evidence (Exhibit 33) general order Number 758 of the Public Utilities Commission, being regulations governing the protection of crossings at grade of roads with railroads in California. Therein contained are diagrams of several signals, including Standard Number 8, an automatic flashing light signal. The purpose of these regulations is stated to formulate uniform standards for grade crossing protection. It provides in section V(a):

"Each public crossing at grade of road, highway or street with a track of a railroad . . . shall, unless exemption is provided for herein, be protected by at least one crossing sign; constructed and installed in substantial conformity with the specifications herein illustrated and designated as Standard No. 1, or Standard No. 1-A."

Standard Number 1's were the ones here erected. Option to install Standard Number 8 is authorized by the rules. Plaintiff claims that defendant Santa Fe's failure to erect a Standard Number 8 signal was negligence.

The court sustained an objection to an offer of proof that defendants had available to them a source of money to pay a proportionate share of the cost of its construction. Error is claimed in this respect, citing *Crane* v. *Smith*, 23 Cal.2d 288, 298 [144 P.2d 356]. Under the circumstances the ruling was proper. As to the Santa Fe, the question of the adequacy of the warning signs at the intersection at the time and under

the circumstances is usually a factual question for the jury unless there is a violation of law or rules which makes that question one of law, in which case there still remains the question of proximate cause and contributory negligence of plaintiff.

At the close of plaintiff's evidence he moved that the court allow the jury to view the premises. The motion was denied and the court stated that in November, at the time of trial, there would be no possibility of similarity of conditions as they existed in February. It does appear that the foliage on the trees, which plaintiff claims diffused the view of the crossing signs by reason of the darker background, would probably be different, but no doubt the weather conditions were dissimilar. There is also evidence that there had been some changes made in respect to this crossing subsequent to the time of the accident. No prejudicial error resulted in this respect. (*Brown* v. *Lemon Cove Ditch Co.*, 36 Cal.App. 94 [171 P. 705] ; Code Civ. Proc., § 610.) Defendants' motions for nonsuit were denied.

Defense witnesses consisted of a highway patrolman who testified he was at the scene of the accident; that as to the weather conditions, visibility "was good . . . the fog had lifted" although there had been fog earlier; that he could clearly see the crossing, raised railroad bed and cross-bucks from Chesnut Avenue; that there were skid marks leading back from the front end of the truck a distance of 96 feet; that the front of the truck was one foot from the rail; that he conversed with plaintiff two hours after the accident in the hospital; that he was conscious and said to the witness that he was driving between 45 and 50 miles per hour and that as he approached the crossing he looked to his left, southward, down the tracks and saw nothing; that he then saw the train coming from the other direction and applied his brakes and tried to swerve to his right; and that he said he almost stopped and then his truck crashed into the train.

The conductor testified he left the caboose and immediately went to the scene; that no other person arrived there until three or four minutes later; that he talked to plaintiff who said he never saw the train or that he didn't see it in time to stop.

Another witness testified she lived at the corner of Chesnut and Nebraska Avenue, about one-fourth mile from the tracks, and that just before the accident she heard the whistle of the train "about twice"; that plaintiff's truck was about opposite

the office buildings of the winery on Nebraska Avenue traveling about 50 miles per hour, and that she immediately thereafter saw the train and witnessed the accident.

Another witness living about 900 feet west of the tracks said he saw the train approaching from the north and later heard the whistle; that the weather conditions were clear; that at the scene he heard plaintiff say ''Why didn't I see the train? I must have fallen asleep.'' The fact that the weather was clear and that the whistle was blown by the trainman was corroborated by other witnesses. Photographs were received in evidence, taken 15 minutes after the accident, indicating that the weather was clear and some shadows were being cast by the sun.

After the parties rested each defendant moved for a directed verdict, which was denied.

The claimed negligence of defendant Santa Fe is predicated mainly upon its failure to place adequate warning signals at the crossing, failure to sound bell and blow whistle on train, and give sufficient and timely warning of the approach of the train; and its claimed negligence in approaching this particular intersection under the circumstances related. There is no question about this intersection being a dangerous one, due mainly to the presence of the buildings and tanks which, to a degree, obscured one's vision of an approaching train under the circumstances related. While the great weight of the evidence is that the whistle did blow within the required distance from the intersection and the bell did ring, warning of the approach of the train, there is some evidence which might justify a contrary conclusion. (*Parker* v. *Southern Pac. Co.*, 204 Cal. 609, 614 [269 P. 622].) Section 7604 of the Public Utilities Code requires a bell to be rung or an air whistle to be sounded at least 80 rods from the place where the railroad crosses any highway, and to be kept ringing or sounding at intervals until it has crossed the highway. The trial judge, in the first trial, was fully justified in granting a new trial for insufficiency of the evidence to support the jury's verdict in favor of plaintiff, because of his disbelief of plaintiff's testimony in respect to the whistling, blowing or sounding of the bell, and as to the question of adequacy of warning signals when considered in connection with the alleged contributory negligence of plaintiff. (*Grover* v. *Sharp & Fellows Contracting Co.*, 66 Cal.App.2d 736 [153 P.2d 83].)

There is no doubt that the installation of a Standard Number 8 automatic flashing signal would have been more adequate than the Standard Number 1 sign erected. Apparently the erection of the Standard Number 1 sign complied with the regulations of the Public Utilities Commission at the time, and no violation of the rules could be claimed because Standard Number 8 was not installed.

In *Green* v. *Southern Pac. Co.*, 53 Cal.App. 194, 202 [199 P. 1059], it was held that the law does impose upon a railroad company the duty to use reasonable care, corresponding to the circumstances constituting the probable danger, and to avoid injury to persons lawfully traveling upon the public highway crossed by the company's tracks and trains. The question as to what is due care, where the view of the tracks is obstructed, is usually left to the jury to say whether, in view of the obstructions, the company has exercised ordinary care with respect to the peculiarly dangerous condition of the crossing; whether ordinarily prudent men would have taken extra precautions and whether such precautions were taken in a particular case. (See also *Marchetti* v. *Southern Pac. Co.*, 204 Cal. 679 [269 P. 529]; and *Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111 [137 P.2d 441].) It is not clear from the brief of defendant Santa Fe what its position is in respect to the presence of evidence sufficient to support a finding of negligence on its part. It states: "Appellant expends considerable effort in his brief to establish railway negligence. Solely for the purpose of this respondent's brief the question of this negligence will be left to the province of the jury." We conclude that there is sufficient evidence to support a finding of negligence as to defendant Santa Fe.

As to defendant county, plaintiff relies upon the claim that a county also has the duty to install adequate warning devices, citing section 465, subdivision (b) of the Vehicle Code, which provides:

"Local authorities in their respective jurisdictions shall place and maintain or cause to be placed and maintained such traffic signs . . . upon streets and highways . . . as *may be necessary* . . . to indicate and to carry out the provisions of this code or local traffic ordinances or to warn or guide traffic." (Italics ours.)

Section 466 of the Vehicle Code provides that no local authority shall erect any stop sign in such a manner as to require the traffic on any state highway to stop before entering or crossing any intersecting highway or any railroad grade

crossing. It was stipulated that the county had erected an "advance warning sign," and it is conceded it had covered the approach to the tracks with oiled gravel, and no "RXR" sign had ever been painted on the highway indicating the approach to such a crossing.

*Shea* v. *City of San Bernardino,* 7 Cal.2d 688 [62 P.2d 365], involved only a rough condition of the street, which condition had been created by the city. It was there held that the city was not relieved of the duty to give adequate warning to those lawfully using the street; and that a dangerous or defective condition of its public streets existed.

The question of the liability of a city or county under section 465, subdivision (b), *supra,* is fully discussed in the late decision of *Perry* v. *City of Santa Monica,* 130 Cal.App.2d 370 [279 P.2d 92] (hearing denied by the Supreme Court). There the city had knowledge that a certain intersection was dangerous because it was a blind one. No traffic signs or stop signs had been erected. Plaintiff collided with another car in that blind intersection. After the accident the city installed stop signs. Plaintiff brought an action under the Public Liability Act of 1923 (now Gov. Code, §§ 53050 and 53051.) The court held that such injuries must result from the dangerous or defective condition of "public property"; that governmental immunity which a city enjoys as a state agency can be taken away only by legislative enactment; that the Public Liability Act was not enacted for the purpose of protecting those who come upon city streets, but only those who sustain injuries by reason of a "dangerous or defective" condition; that a city is not an insurer of the safety of its travelers; that it is required only to exercise ordinary care to maintain its streets in a reasonably safe condition for those using them; and that there was no allegation in the complaint that irregularities, defects or obstructions existed in the streets themselves; and that accordingly plaintiff failed to state a cause of action against the city for personal injuries, citing cases. Plaintiffs there contended that the city, under the Vehicle Code section here involved, had the affirmative duty to erect boulevard stop signs at the intersection. The court held that the section (on which plaintiff here relies) "does not compel local authorities to place signs or signals at a particular intersection. They are directed to place them upon streets and highways 'as may be necessary.' Clearly the local authorities are to determine

when a sign or signal is necessary at a particular intersection."

*Bradshaw* v. *City of Seattle,* 43 Wn.2d 766 [264 P.2d 265, 42 A.L.R.2d 800], is there cited as analogous. A similar statute was there construed and it was said, at page 271 [264 P.2d]:

"In the absence of an express statute, a municipality cannot be held liable for failure to erect warning signs or barriers to apprise travelers of extraordinary or unusual conditions unless the danger existed in the highway itself."

It must be concluded from the Perry case that the burden is on the plaintiff to show an actionable wrong; and to hold that the county had the additional affirmative duty to paint "RXR" signs on the highway in addition to the other signs in question would unduly extend the scope of the Public Liability law and go far toward establishing the rule that a county is an insurer. We are unable to distinguish the Perry case from the facts and the law relied upon in the instant case. (See also *Campbell* v. *City of Santa Monica,* 51 Cal.App.2d 626 [125 P.2d 561].)

It is true that a defective or dangerous condition can be created by use or general plan of operation of government operated property as well as by structural defect, and it has been held that where a city makes a certain street a through highway, it is incumbent upon it to erect and maintain a "stop sign" at an intersecting street. (*Irvin* v. *Padelford,* 127 Cal.App.2d 135 [273 P.2d 539].) There, a stop sign had been erected but was taken down by a city employee. Here, no sign "RXR" crossing had ever been painted on the highway and the board of supervisors had never found, in addition to the signs already erected, that it was necessary. The dangerous condition existing at this crossing was not created by the county but by the building of the winery and the plant at the site indicated. Under the facts related, it appears to us that the granting of a verdict in favor of the county was justified.

The remaining question as to the defendant Santa Fe, is whether it can be held, as a matter of law, that plaintiff was guilty of contributory negligence. On a trial by a jury or the court, either would have been justified in finding there was negligence on the part of the plaintiff contributing to his injuries and that he probably would not have seen any signs or warning had they been present, since there is testimony that plaintiff admitted he did not see those that were there and said "I must have fallen asleep." However, on this

appeal it is an elementary principle of law that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support a finding in support of plaintiff in this respect.

In *Toschi* v. *Christian*, 24 Cal.2d 354, 360 [149 P.2d 848], in reversing a judgment of nonsuit the court said:

". . . the actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law." And on page 361: " '. . . where it is shown that a plaintiff has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury.' "

Here, the view of the approaching train was obstructed for a considerable distance and it was a dangerous crossing for a vehicle approaching from the east. It cannot be said, from plaintiff's position, that the approach of the train was reasonably apparent. His first possible view of it, as he thus approached, was approximately 150-100 feet from the tracks. He testified he then looked and saw the train approaching. The skid marks extended for a distance of 96 feet, which might well indicate that plaintiff must have looked shortly prior to that point and first saw the train but was unable to bring the truck to a stop in time to avoid the collision. The vehicle and the train were traveling at approximately the same speed. This could fairly fix the position of the engine when plaintiff first observed it. Although the question is a close one (*Kilgore* v. *Southern Pac. Co.*, 9 Cal. App.2d 506, 509 [50 P.2d 116], and cases cited; and *Heintz* v. *Southern Pac. Co.*, 63 Cal.App.2d 699 [147 P.2d 621]) we feel bound by the general rule that the circumstances admit of a reasonable doubt as to whether the questioned conduct of the plaintiff falls within or without the bounds of ordinary care. Accordingly, it must be resolved as a matter of fact rather than of law. (*Startup* v. *Pacific Elec. Ry. Co.*, 29 Cal. 2d 866, 871 [180 P.2d 896].)

It is lastly contended by plaintiff that the trial court erred in refusing to receive in evidence certain documents including a certificate of the secretary of the Public Utilities Commission certifying that since August 31, 1946, there had

been several other accidents at this same intersection. There is no indication that they were similar in character and happened under like circumstances. █ Other exhibits offered were two resolutions of the board of supervisors indicating an intention of the county to cooperate with the city in the proposed removal of the Santa Fe tracks in Fresno, and have no specific reference to the intersection here involved. The trial court was justified in refusing them. (*Thompson* v. *Buffums', Inc.*, 17 Cal.App.2d 401 [62 P.2d 171].)

Judgment in favor of the Santa Fe reversed. Judgment in favor of the county affirmed.

Barnard, P. J., and Mussell, J., concurred.