[Crim. No. 6828. In Bank. Apr. 19, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. DOYLE ALVA TERRY, Defendant and Appellant.

Frank Duncan and Katz & Duncan for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

DOOLING, J.—Defendants Doyle Alva Terry and Ross Edwin Wilson, Jr., were charged in an information with one count of conspiracy to commit robbery (10 overt acts alleged), five counts of robbery, and the final count of murder of Vernon J. Owings. Prior convictions of felony (moral offenses) were also alleged against each defendant: Terry, violations of Penal Code sections 288 and 286; Wilson, violation of Penal Code section 288. Defendants were arraigned; their motions to quash (Pen. Code, § 858) and to dismiss (Pen. Code, § 995) were denied. Defendants thereupon entered pleas of not guilty to each count and denied the prior convictions. Terry then moved for the right to appear in propria persona and with counsel; and his counsel (Frank Duncan) renewed the motion to quash on the ground that Terry was denied his right to aid of counsel at the time of arraignment. The latter motion was heard on conflicting affidavits (Terry's affidavit as against those of the deputy public defender and two Long Beach police officers). Both motions were denied. When the case was called for trial, each defendant admitted the prior convictions. Midway in the trial and just before the People concluded its case, defendant Wilson withdrew his plea of not guilty to counts one and four (conspiracy to rob and robbery) and entered pleas of guilty thereto; the remaining counts were dismissed as to him and he filed an application for probation. Wilson thereupon testified for the People.

A verdict of guilty was returned against Terry on each count, with the jury finding the crimes of robbery and murder to be first degree. Trial was then had on the issue of penalty on the murder count and the punishment was fixed at death. Terry's motions for new trial, in arrest of judgment and for reduction of the punishment to life imprisonment were denied. Sentence as prescribed by law was pronounced on the first six counts, to run consecutively, and the death sentence was imposed for the murder. The appeal is automatic. (Pen. Code, § 1239.)

On June 24, 1960, about 6 p. m. Officers Brizendine and Owings were driving in a police car on patrol duty in the area of the Terminal Island Naval Station. They noticed two cars, one a black 1950 Cadillac and the other a maroon 1950 Chrysler, each with a single occupant, the driver, move out of a parking lot and turn onto Seaside Boulevard. About 10 minutes later the two officers proceeded down Seaside Boulevard and saw the same two cars standing on the side of the road. A Ford was parked in front of the Cadillac. Observing that the hood on the Cadillac was raised and that Wilson was looking into the engine, the two officers stopped to give assistance. Terry was in the Chrysler, which was parked directly behind the Cadillac. The officers stopped the police car to the side of the Chrysler; Brizendine walked forward to the Cadillac and Owings walked to the rear of the police car toward the Chrysler. Brizendine asked Wilson what was the matter and Wilson replied, ''I don't know. It just quit running.'' Brizendine responded that it was running a little while ago. At that moment a shot was heard, apparently coming from the rear of the police car and the rear of the Chrysler. Brizendine turned and saw Owings fall to the ground as Terry stood firing a gun. Terry then started shooting at Brizendine, hitting him in the leg. Brizendine saw Wilson move out from the Cadillac and began firing toward him, hitting Wilson in the hands. Meanwhile Terry advanced on Brizendine; there was an exchange of shots between the two and Brizendine retreated behind the Ford. Terry stooped to fire under the Ford at Brizendine but he ran out of ammunition. Terry then ran to the Chrysler, got into the driver's seat and with Wilson beside him, backed out the car, driving over Owings' fallen body and sped down Seaside Boulevard.

Officer Brizendine went to Officer Owings' body lying in a pool of blood and saw that Owings' gun was still snapped in

the holster. Brizendine then went to his police car and broadcast a description of the Chrysler over the radio. A few minutes later Brizendine saw the Chrysler returning down Seaside Boulevard at a high rate of speed. Apparently the pontoon bridge at the end of the road was raised and egress from the island was blocked, so Terry had swerved around backtracking and met a police car that had been alerted by Brizendine's broadcast. There was an exchange of gunfire as the Chrysler sped past the police car. Meanwhile Wilson jumped out of the moving Chrysler and Terry continued down the road alone. A few minutes later the pursuing police came upon the abandoned Chrysler. After a brief search they found Terry on the road and took him into custody. In the meantime Wilson had hitchhiked to the hospital, where he was taken into custody.

In the abandoned Chrysler there was found a .44 Magnum revolver with six spent shells in the cylinder. Owings had died as the result of a gunshot wound in the head, and an expert criminologist at the trial identified the Magnum revolver as firing the death bullet. Further search of the Chrysler revealed radio equipment over which the Los Angeles Police Department and F.B.I. calls could be heard; and two tin helmets were found in the car's trunk. At the time of arrest, identification papers were found on Terry indicating that he was then going by the name of Warren Durfy and on Wilson indicating that he was then going by the name of Michael Dupree.

It was the prosecution's theory that Terry shot Owings in the process of avoiding arrest because of implication in a series of robberies in the state committed over a period of some three years. Accordingly, the prosecution presented evidence establishing a conspiracy to commit robberies existing between defendants Terry and Wilson as well as with certain other persons—Richard Vashon, Jack Corser and Chuck Stanford—a five-man gang operating mainly in the Los Angeles-Hollywood area. Terry was supposedly the leader; Vashon, Corser and Stanford were in court during the trial for purposes of identification with various robberies.

In March 1958 Terry and Vashon occupied an apartment together in Hollywood. On June 17, 1958, Stanley Soboroff, an assistant manager for Thrifty Drugstore on Hollywood Boulevard, was carrying a bag of money on his way to the bank to make a deposit. It was about 2:30 p. m. A man holding a gun accosted Soboroff on the street and told him to

"Drop the bag." Soboroff handed the bag to the gunman, who then jumped into a waiting car (a 1957 black Buick) and the two robbers sped away. Vashon fitted the general description of the gunman. Passers-by noted the license on the Buick, which the police found abandoned in the Hollywood hills some six weeks later. About four weeks before the Thrifty Drugstore robbery a black 1957 Buick had been reported stolen from a parking lot, though with a different license. The license plate observed on the Buick at the time of the robbery was identified as belonging to a car in a U-Drive garage, which plate was noted as missing a few days before the robbery. This apparently was the general modus operandi of the robberies: use of a stolen car, with change of license plates to thwart detection. This Thrifty Drugstore robbery was neither one of the robberies charged nor one of the overt acts alleged in support of the conspiracy but was introduced in evidence to show the commencement of the ensuing series of alleged robberies and held relevant to Terry's motive in shooting Officer Owings without waiting for any talk with him and his companion officer on June 24, 1960.

In line with this theory the prosecution introduced evidence of robberies committed in 1959 which were neither overt acts alleged in support of the conspiracy count nor robberies charged in the robbery counts but which followed the same general pattern wherein Terry was identified as the driver in the waiting car and Vashon was identified as the holdup man accosting his victims with a gun: March, 1959, a noon robbery of the Bank of America in Beverly Hills; August 4, 1959, the assistant manager of another Thrifty Drugstore in the Westchester area, en route to make a bank deposit; August 14, 1959, a Brink's guard picking up money in the afternoon at the Emporium store in Stonestown, San Francisco (the only robbery outside of Southern California), with shooting and wounding of the guard during the holdup; October 23, 1959, a manager of a Safeway store in Reseda on his return from the bank. On January 8, 1960, an employee of an El Monte market was robbed on his return from the bank; Vashon was identified as the driver who also wielded the gun, and Corser was identified as the passenger in the holdup car.

Then follow the robberies charged in the five robbery counts and also alleged among the overt acts in support of the conspiracy count: (1) January 22, 1960, James Deglas, a restaurant owner in Reseda, was robbed of some $225 which he had just withdrawn from the bank; Corser was identified as

the gunman and Terry as the driver of the waiting car; the robbers were wearing false mustaches and beards. (2) March 4, 1960, Fred Rambaud, an employee of a Covina school, was robbed of some money bags on his way to make a bank deposit; the gunman wore a false mustache and goatee. (3) March 21, 1960, Morris Danielson, manager of the Sav-On Drugstore in Granada Hills, was robbed of a bag of currency and checks he was carrying to the bank for deposit; Wilson was identified as the gunman and Terry as the driver. (4) April 25, 1960, Theodore Weiss, manager of the Holiday Hardware store in San Fernando Valley, was robbed of checks and currency on his way to make a bank deposit; Stanford was identified as the gunman. (5) June 16, 1960, Eunice Martin, an office girl for the Sav-On Drugstore in the Azusa shopping center, was robbed of money and checks while en route to the bank to make a deposit; Wilson was identified as the gunman and Terry as the driver.

Evidence was also offered of several other robberies of businessmen, neither alleged as overt acts nor as additional crimes, committed in 1960 and following the same general pattern in that the victims were either carrying money for deposit at the bank or leaving the bank with money withdrawn. The daytime robberies always involved two men— driver and gunman; Terry usually was the driver but his companion often varied—Wilson, Stanford or Corser. Stolen cars were used, license plates were changed, the robbers in many instances were described as wearing false mustaches and goatees. Witnesses testified to having seen Terry and different members of his gang ''casing'' markets and banks before robberies were later committed; there were repeat offenses in and about the same area, usually robbing of depositors on the way to the same bank. Guns used in the robberies were identified as having been purchased by Terry or his confederates during the period involved. In January 1960, the police acting on a charge against Terry of child-molesting and furnishing narcotics to a minor, went to Terry's apartment, saw Wilson in bed there, searched the apartment and Terry's car, and found narcotic paraphernalia. Numerous witnesses were called to testify to the identification of the robbers, stolen cars and license plates, making the People's evidence extremely detailed and lengthy in dovetailing the alleged criminal activities of defendants and their confederates in the gang set-up.

After pleading guilty to counts one and four and having the

other counts dismissed, Wilson testified for the People. Wilson said that he had known Terry since 1955 and Terry had told him of having committed certain robberies with Vashon and Corser. Wilson stated that Terry told him about the advantages of casing places, noting persons in the area, and planning the robberies accordingly; that Terry made lists of markets to watch and banks nearby; that they used make-up and false mustaches and beards before going on their jobs; that various cars were stolen, license plates changed, and then after the jobs were completed the cars would be abandoned.

With respect to June 24, 1960, Wilson stated that he had previously been questioned by the police about the black Cadillac which he and Terry had used on a couple of jobs and Terry thought they should get rid of it; that they decided to take it out of the area and so drove to the Naval Base, Terry in the Cadillac and Wilson in the Chrysler; that they were engaged in taking the battery out of the Cadillac when the police officers stopped to give help. Wilson's story corroborated that of Officer Brizendine as to the shooting of Officer Owings. Wilson stated that he was forced at gunpoint by Terry to get in the Chrysler, the escape car, as they sped from the scene; that in the course of the wild drive down the road when Terry's ammunition was spent in firing at the pursuing police, he, Wilson, jumped out of the Chrysler, and Terry continued on. Wilson eventually hitchhiked to a hospital.

On June 26, 1960, Wilson was interviewed by police in the Los Angeles County Hospital. Wilson said that Terry had shot the officer. He further told the police that he was staying with Terry in a Hollywood apartment and would take them there. (Terry never consented to the search of the apartment and it was stipulated that Terry would testify that he had not given Wilson permission to reside there.) A search of the premises revealed a number of guns and ammunition such as were used in the robberies, a notebook containing a list of markets such as were robbed and the writing was identified by a handwriting expert as Terry's, a box of beards and mustaches, a tin helmet such as was worn by the perpetrators of the robberies, and a number of cut license plates.

Wilson also related a conversation which he had with Terry while both were in custody in the Hall of Justice on July 11, 1960: That Terry said that on the day of the homicide he had the Luger gun wrapped in a brown sweater, which he

moved from the Cadillac to the Chrysler after the cars were parked; that Officer Owings asked what was in the sweater and Terry responded that it was none of his business; that the officer insisted on seeing what it was, so Terry jerked away the sweater exposing the gun; that as the officer reached for his gun, Terry shot him. Wilson further stated that as Terry told his story, he "cackled" and "slapped his knees."

Wilson said that Terry had asked him to go in on the robberies because Vashon had lost his nerve; that Terry also had trouble with the police while working with Vashon when the police, in searching Vashon's apartment, confiscated some make-up (a skin darkener and tooth blackening process) as well as beards and mustaches, hats and sunglasses.

Terry testified in his own behalf. He stated that he had come to California some seven years ago from Oklahoma. He admitted that he had purchased many firearms, including those purchases related by witnesses for the prosecution, as he liked to collect guns, but none after his felony conviction in March 1959, because he knew that it would be against the law for him then to be in possession of firearms. He denied ever having participated in any robberies with Vashon, Corser, Stanford or Wilson. He said that he had never been in San Francisco in 1959 so as to have taken part in the Brink's robbery at the Emporium in Stonestown. He admitted having made the list of markets in the notebook found by the police but said that he was just making a list of possible places of employment for a friend. He stated that Wilson, not he, owned the black Cadillac; that when Wilson wanted to get rid of the Cadillac because the police were looking for it, he agreed to and did drive in his Chrysler, with Wilson in the Cadillac to the Naval Base where they intended to leave the Cadillac; that while Wilson was working to remove the battery, Wilson saw the approaching police car and got panicky because the gun was in the car under a sweater; that when the officer (Owings) approached Terry asking to see what was under the sweater and reached for the sweater, the gun went off and the officer fell; that the other officer (Brizendine) started shooting and Terry panicked, returning the gunfire; that Wilson bleeding from his wounds voluntarily got into the Chrysler; that as they sped down the road pursued by the police shooting at them, Terry told Wilson to get out of the car so as not to be killed. Terry finally denied that he had ever laughed about killing the officer as Wilson

had related in reporting their conversation while in custody on July 11, 1960.

In rebuttal, a firearms expert described how the type of gun that was used in the homicide acted; that it would not fire unless the trigger was pulled.

As above stated, the People's case rested on the theory that Terry, apprehensive of being questioned by the police because of the series of robberies in which he had been engaged, shot Officer Owings; that his motive was flight to escape arrest. The defense rested on the premise that Terry was innocent of any criminal conspiracy or robbery charges; that the two police officers stopped on the road beside Wilson and Terry and without cause undertook to search the two cars; that one of the officers (Owings) lunged forward to grab the sweater from Terry, startling him and discharging the gun, resulting in the accidental death of the officer.

Appellant Terry does not challenge the sufficiency of the evidence to sustain his convictions. His grounds for reversal concern generally the alleged denial of constitutional rights in certain respects, erroneous rulings of the court on the presentation of evidence, errors in the instructions, improprieties in the court's comments, and prejudicial misconduct of the two deputy district attorneys. We consider these arguments in the order in which they appear in appellant's brief.

1. *Appellant was not legally committed because he was denied counsel at his arraignment.*

The arraignment was on June 27, 1960, in the Long Beach Municipal Court. No transcription of the proceedings was made. Allegedly at that time Terry asked the magistrate to be allowed to secure private counsel and said that he had funds for that purpose but a continuance was refused; a deputy public defender was appointed to represent Terry and the arraignment proceeded; in the course of the arraignment, Terry told how he had been brutally beaten by the police in an effort to obtain a written confession; Terry said that he wanted to be his own attorney and did not want the deputy public defender but the court nevertheless proceeded and continued the matter for preliminary examination to July 1. At the preliminary examination Terry was represented by private counsel (Russell Parsons), who moved to quash the proceeding against Terry on the ground of improper arraignment; the motion was denied and Terry was held to answer for murder.

On August 8, 1960, Terry (represented by present counsel Frank Duncan) moved to set aside the information because of improper arraignment (Pen. Code, § 995) ; and on August 16 the motion was renewed and again denied. The matter was heard on the basis of affidavits (Terry's affidavit against the affidavits of the deputy public defender and two police officers) and testimony of the deputy public defender who represented Terry at the arraignment. According to the deputy public defender's affidavit, both defendants were specifically advised of their right to counsel; when Terry said that he was not sure whether he had funds to employ counsel, the deputy public defender volunteered to represent Terry until Terry obtained private counsel and thereupon the court appointed the deputy public defender to act as Terry's attorney; Terry made no objection; Wilson advised the court that he would have his own private counsel and the matter was continued for preliminary hearing; and later the deputy public defender visited Terry at the jail but before they were able to confer, he learned that Terry had retained private counsel. In his testimony the deputy public defender confirmed the recitals of his affidavit. He added that Terry had asked for a continuance to secure private counsel; that Terry had stated that he had been beaten and Terry appeared to have sustained some injuries, showing bruises on his face and one eye closed, and wearing bandages ; that he had had no previous conversation with Terry prior to the arraignment. Terry's affidavit recited that at the arraignment he had told the magistrate his money had been taken from him and he had not been allowed to call a lawyer; that he had been beaten and tortured by the police because he would not sign a confession; that the court said that a public defender would be appointed for him; that he said that he wanted his own counsel and would like a continuance but the court nevertheless proceeded with the arraignment, and without further comment set the preliminary hearing for July 1, 1960. The two police affidavits stated that. Terry on June 25, 1960, had placed a long distance call to Oklahoma and discussed the hiring of an attorney; that he was taken to a phone as soon as he requested; that at no time during custody and prior to arraignment on June 27, 1960, was Terry threatened or abused nor denied the right to consult counsel, and that he had in fact consulted with counsel (an associate of Parsons, who represented Terry at the preliminary hearing) on June 25 (two days before the arraignment).

Upon this substantial conflict the Los Angeles Superior Court at the August 16, 1960, proceedings denied appellant's motion under Penal Code section 995 and his motion to quash.

Appellant cites Penal Code section 859 that "the magistrate must, upon the request of the defendant, require a peace officer to take a message to any counsel whom the defendant may name," and the "officer must, without delay . . . perform that duty"; that the right to counsel is a constitutional guarantee. (U.S. Const., Amend. VI; Cal. Const., art. I, § 13; *People* v. *Napthaly*, 105 Cal. 641 [39 P. 29].) Admittedly, the deputy public defender appointed to represent appellant did not consult with him prior to arraignment. Appellant claims that he therefore had only a "token representation" at the arraignment and such conduct "reeks with prejudice"; that prejudice will be presumed in any event because of the court's refusal of a continuance for appellant to secure counsel for arraignment, amounting to denial of a fundamental constitutional right. (*People* v. *Elliot*, 54 Cal.2d 498, 505 [6 Cal. Rptr. 753, 354 P.2d 225].)

Respondent agrees that a defendant's right to counsel in the pretrial stages is valuable and substantial. (*People* v. *Avilez*, 86 Cal.App.2d 289, 294 [194 P.2d 829].) ▮▮▮▮ Here the magistrate informed appellant of his right to counsel (Pen. Code, § 858) and the preliminary examination was continued three days (Pen. Code, § 860), within which time appellant secured counsel. Meanwhile the deputy public defender was appointed at the arraignment and appellant's substantive rights were fully protected. (See *People* v. *Greene*, 80 Cal.App.2d 745, 748 [182 P.2d 576].) There is no showing that any action was taken at the arraignment to appellant's disadvantage; it does not appear that appellant made any request to send a message to any named counsel and the court apparently was satisfied that the deputy public defender would help appellant secure such counsel as he might wish later for the preliminary examination. The fact that the deputy public defender did not consult with appellant prior to the arraignment is not necessarily a "token representation" as that may not have been necessary under the circumstances and appellant has shown no actual prejudice. In the Elliott case the violation of the defendant's constitutional right arose from the committing magistrate's failure to comply with the mandatory provision of Penal Code section 868 requiring the court to exclude, at defendant's request, unauthorized persons from the courtroom during the preliminary examination; and

from such error it would be difficult to prove prejudice and it will be presumed. Here if appellant suffered prejudice in the handling of the arraignment proceedings, it could be proved and therefore should not be presumed. A person must be "legally committed" (Pen. Code, § 995) but an information will not be set aside because of "some irregularity or minor error in procedure." (*People* v. *Elliot, supra,* 54 Cal.2d 498, 502-503.)

The relevant code provisions covering the right to counsel before the committing magistrate are here quoted:

Penal Code, section 859: "When the defendant is charged with the commission of a public offense, over which the superior court has original jurisdiction, by a written complaint subscribed under oath and on file in a court within the county in which the public offense is triable, he shall, without unnecessary delay, be taken before a magistrate of the court in which such complaint is on file. The magistrate shall immediately deliver to him a copy of the complaint, inform him of his right to the aid of counsel, ask him if he desires the aid of counsel, and allow him a reasonable time to send for counsel; and the magistrate must, upon the request of the defendant, require a peace officer to take a message to any counsel whom the defendant may name, in the judicial district in which the court is situated. The officer must, without delay and without fee, perform that duty. . . ."

Penal Code, section 860: "If the public offense is. . . .

"2. A felony punishable with death, or is

"3. A felony to which the defendant has not pleaded guilty in accordance with section 859a of this code, then, if the defendant requires the aid of counsel, the magistrate must allow the defendant a reasonable time to send for counsel, and may postpone the examination for not less than two nor more than five days for that purpose. . . ."

 The "examination" referred to in the latter section is what is commonly called the preliminary hearing, at which evidence is taken to determine whether probable cause exists for holding the defendant to answer in the superior court. (Pen. Code, §§ 861-877.) The evident purpose of the provisions of sections 859 and 860 is to assure that the accused is afforded every reasonable opportunity to secure and be represented by counsel of his own choice before the magistrate begins the "examination," i.e., before the introduction of any evidence or the examination of any witnesses before the magistrate. In this case the defendant was fully

protected in that right. After the arraignment before the magistrate, i.e., the delivery of a copy of the complaint to the defendant and informing him of his right to counsel in accordance with section 859, the magistrate continued the preliminary examination to July 1, 1960, at which time defendant did appear with counsel of his choice. This was substantial compliance with Penal Code, section 860, and no evidence concerning the charges contained in the complaint was introduced before the magistrate until after defendant was in court with counsel of his choice. Thus at every material stage of the proceedings when defendant's substantial rights were in issue, he had the assistance of counsel of his own choice, and we cannot find under the facts of this case that defendant's constitutional or statutory right to counsel was denied to him. There is nothing in *Hamilton* v. *State of Alabama*, 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114], which conflicts with this conclusion. The United States Supreme Court pointed out in *Hamilton* that certain pleas and motions could only be made under Alabama law at the preliminary stage in which the defendant appeared without counsel. Under our law there are no such pleas or motions which must be made in advance of the preliminary hearing, and for that reason the holding in *Hamilton* is not in point.

2. *The information was improperly drawn.*

The information, following the short form prescribed by Penal Code, sections 951 and 952, charged defendants with the "crime of murder, in violation of Section 187, Penal Code, a felony, committed as follows: That the said DOYLE ALVA TERRY and ROSS EDISON WILSON, JR., on or about the 24th day of June, 1960, at and in the County of Los Angeles, State of California, did willfully, unlawfully and feloniously and with malice aforethought murder VERNON J. OWINGS, a human being."

Appellant argues that such information was not sufficient to give him notice of the charge of first degree murder; that in the absence of specific allegations of circumstances raising murder to the level of first degree, he was in fact charged with second degree, and the statutory form allowed by Penal Code sections 951 and 952 is unconstitutional.

The sufficiency of the assailed information as a first degree murder charge was upheld in *People* v. *Jordan*, 45 Cal.2d 697, 709 [290 P.2d 484], and *People* v. *Atchley*, 132 Cal.App. 2d 444, 446 [282 P.2d 160]. Moreover appellant had a tran-

script of the preliminary proceedings so as to appreciate in the main the circumstances of the homicide involved (see *People* v. *Marshall*, 48 Cal.2d 394, 399 [309 P.2d 456] [footnotes 4 and 5]) and during the *voir dire* examination of the jury, frequent reference was made both by the defense and the prosecution to the penalty that might be inflicted for first degree murder. In short, both appellant and his counsel realized what the charge of murder covered.

3. *Appellant was denied the benefit of the presumption of innocence.*

Appellant argues that Penal Code sections 187, 188 and 1105 operate to dispel the presumption of innocence to which he is entitled through the trial and shift the burden of proof on him to establish a lesser degree of guilt. His argument is not clear but it may stem from the rule that where an unlawful killing is shown but nothing more, the verdict should be murder of the second, and not first, degree. (*People* v. *Craig*, 49 Cal.2d 313, 319 [316 P.2d 947].)

There is nothing in the record to indicate that at any stage of the proceedings appellant was presumed to be guilty. The circumstances and alleged motivating causes of the killing under the prosecution's theory were shown in great detail in tracing the series of crimes wherein appellant was implicated. The court gave CALJIC instructions No. 303 setting forth the law with reference to premeditation in first degree murder, No. 305 with reference to murder in the second degree, No. 305-A with reference to the course which should be followed by the jury in the event of a doubt as to whether it was murder in the first or second degree, No. 308-B with reference to involuntary manslaughter, and No. 310 with reference to the distinction between murder and manslaughter. It does not appear who requested the homicide instructions. In *People* v. *Graham*, 191 Cal.App.2d 521, 530-532 [12 Cal. Rptr. 893], a murder prosecution, these standard instructions were discussed and the operative presumptions were analyzed as consistent with due process of law principles where the jury was fully informed in the instructions of the applicable rules of law and the prosecution relied on the evidence introduced in court rather than on any presumption to show defendant's malice.

4. *Evidence was improperly admitted.*

Appellant objects to the introduction into evidence of Exhibit 24, a scrap of a social security check which was cashed at the Emporium in Stonestown on August 13, 1959,

the day before the Brink's guard who had picked up a loaded money box was robbed on the way to his truck parked outside the store. The check was found on November 17, 1959, by the Oklahoma police in the course of searching appellant's red 1954 Chevrolet while it was in the police department's parking lot in Tulsa and appellant was then being held in police custody. It was stipulated that the Oklahoma police did not then have a warrant for appellant's arrest nor a search warrant for the car. The arresting officers did not testify but only the Oklahoma officer who said he found the fragment of check under the back seat. The check was given over to the chief of detectives and then passed to a federal postal inspector, and the testifying officer never again saw it until it was shown to him at the trial. He further testified that both appellant and the car were released that day, and appellant was later seen driving the car in Tulsa. There were no identifying marks on the piece of check.

Appellant argues that such check fragment was inadmissible under the exclusionary rule of *People* v. *Cahan*, 44 Cal. 2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], as the product of an illegal search and seizure. He also cites *Elkins* v. *United States*, 364 U.S. 206 [80 S.Ct. 1437, 4 L.Ed.2d 1669], and *Rios* v. *United States*, 364 U.S. 253 [80 S.Ct. 1431, 4 L.Ed.2d 1688], applying the *Cahan* rule in reference to a federal court prosecution, with its validity dependent on whether the conduct of state police officers in obtaining evidence in the arrest and search was lawful.

Appellant further argues that the chain of possession was not properly established prior to admission of the check fragment in evidence, in negation of any possibility of alteration between the time the evidence in question was first secured and its production in court. (*People* v. *Riser*, 47 Cal.2d 566, 580-581 [305 P.2d 1] [fingerprints on a glass]; also *Dobson* v. *Industrial Acc. Com.*, 114 Cal.App.2d 782, 785 [251 P.2d 349] [a blood sample]; *McGowan* v. *City of Los Angeles*, 100 Cal.App.2d 386, 389-392 [223 P.2d 862, 21 A.L.R.2d 1206] [a blood alcohol analysis]; *People* v. *Smith*, 55 Cal.App. 324, 330-331 [203 P. 816] [stomach analysis].)

We find it unnecessary to decide the novel and difficult question whether the exclusionary rule should be extended to evidence obtained by an unlawful search made in another state by officers of that state,[1] or whether the check fragment

[1] The Attorney General cites the following as supporting the admissibility of such evidence: 55 N.W. U.L. Rev. 525, 549-551; *People* v. *Win-*

was sufficiently identified (although we note that the testifying officer positively identified the check fragment as the one which he had found). Even if error occurred in its introduction, under the facts of this case we cannot hold it prejudicial. The Stonestown robbery was only one of a great number of robberies testified to and, in view of the cumulative weight of the testimony as to the other robberies and appellant's connection with them, the introduction of this evidence tending to connect appellant with the Stonestown robbery cannot be held to have been prejudicial. (*People* v. *Tarantino*, 45 Cal.2d 590, 598 [290 P.2d 505].)

 Appellant also argues that after his arrest his codefendant Wilson gave unauthorized consent to the police for search and seizure of evidence in appellant's apartment: certain guns and ammunition, false mustaches and beards, letters, a red notebook, a pair of gloves and a tin helmet were there found and introduced in evidence over objection. Two days after his arrest Wilson was interviewed by the police in the hospital; he agreed to and did take the police to appellant's apartment. It was stipulated that appellant had not given his consent to the search and that he would testify that he had not given Wilson permission to live there. While Wilson had a key to appellant's apartment, appellant argues that the key was only given to Wilson for the purpose of bringing certain items to store in appellant's apartment, and not with the idea that Wilson would live there. The landlord had testified that he had leased the apartment to appellant under the name of Warren J. Durfy sometime between June 15 and 20, 1960, with the agreement that the rent was to start on July 1 but appellant could take possession any time before that date; that at the time of leasing the apartment, appellant said that he had a friend who would occupy it with him; that on June 24, when the landlord stopped by the premises, he saw appellant and his friend, who was introduced as Michael Dupree (codefendant Wilson's assumed name), and it was then indicated that Dupree was the other man who would occupy the apartment with appellant. In overruling appellant's objection to the introduction of the above-recited evidence because unlawfully seized, the court concluded that it could reasonably be in-

---

*terheld,* 359 Mich. 467 [102 N.W.2d 201, 202-203]; *People* v. *Touhy,* 361 Ill. 332 [197 N.E. 849, 856-857]; *State* v. *Olsen,* 212 Ore. 191 [317 P.2d 938, 940]; *Young* v. *Commonwealth* (Ky.), 313 S.W.2d 580, 581; *Kaufman* v. *State,* 189 Tenn. 315 [225 S.W.2d 75, 76-77].

ferred from the landlord's testimony that appellant and Wilson were jointly occupying the apartment. Since this finding was supported by substantial evidence, there was no error in the admission of the articles discovered in the search. (*People* v. *Ransome*, 180 Cal.App.2d 140, 145-146 [4 Cal. Rptr. 347]; *People* v. *Howard*, 166 Cal.App.2d 638, 651 [334 P.2d 105]; *cf. People* v. *Ingle*, 53 Cal.2d 407, 415-416 [348 P.2d 577].)

*5. Codefendant Wilson was improperly allowed to testify as the prosecution was ending its case.*

 Wilson changed his plea to guilty on counts one and four; the other counts were dismissed against him on motion of the prosecution and Wilson applied for probation. The prosecution then called Wilson as a witness and he gave very damaging testimony against appellant. Appellant characterizes this procedure as a "devil's bargain" upon the claim that Wilson gave his testimony in return for immunity on several robbery counts and the murder charge; that there obviously was a conspiracy between the prosecution, Wilson and Wilson's counsel in effecting this deal against appellant. Appellant takes the position that Wilson as a codefendant was allowed to sit in the courtroom through the presentation of the prosecution's case whereas witnesses generally had been excluded from the courtroom; that as a codefendant Wilson's status was that of an accomplice, whose testimony would need corroboration and by hearing all the prosecution witnesses give testimony, Wilson was able to set his testimony in a corroborating pattern and so strengthen the prosecution's case; and that following the rationale of the *Cahan* case, Wilson's testimony should be deemed inadmissible under the full import of the exclusionary rule therein adopted.

Respondent argues that Wilson's testimony was properly admitted under Penal Code, section 1099. The testimony was given before the defense started. (*People* v. *Griffin*, 98 Cal. App.2d 1, 8, 49-50 [219 P.2d 519]; *People* v. *Chapman*, 91 Cal.App.2d 854, 857 [206 P.2d 4].) When Wilson took the stand, the prosecution against him had been resolved. Preliminarily, Wilson testified to the court that he had been promised no reward for his change of plea nor had he been threatened or coerced. Appellant moved for a new trial on the ground that the timing of Wilson's change of plea and granting of immunity was prejudicial coming at the end of the prosecution's case rather than at the beginning of the

trial; the motion was denied. Wilson testified that he did not decide to change his plea until a few minutes before he actually did, after consultation with his attorney; and the court observed that throughout the presentation of the prosecution's case for some several weeks, Wilson's counsel had been energetic with objections and had put up a spirited defense; that there was nothing to indicate any conspiracy between the prosecution and Wilson's counsel to make a surprise move as the prosecution ended its case. While there was a probation hearing pending against Wilson and the imposition of sentence incident to his plea of guilty to two of the seven counts, these considerations do not indicate that Wilson's eventual punishment would be conditioned upon his testimony as a prosecution witness. We must accord a presumption of good faith to the trial judge whose duty it is to rule upon the application for probation and impose sentence. Penal Code section 1099 authorizes the discharge of a defendant jointly charged "at any time before the defendants have gone into their defense . . . that he may be a witness for the people." Obviously any such defendant must have been present at the trial and it would completely nullify the purpose of this section if the fact that he had heard the testimony of other witnesses would disqualify him from testifying. The further fact that Wilson pleaded guilty to two counts does not prevent the dismissal of the other counts against him pursuant to section 1099. After his plea of guilty to the two counts, the remaining counts were the only charges pending against him and unresolved. Their dismissal under these circumstances falls reasonably within the purpose of section 1099. The credibility of Wilson's testimony under the circumstances existing was properly a question to be left to the jury's determination.

6. *Appellant's discovery motion was improperly denied.*

 After the trial was started, appellant made a motion for discovery asking in effect for names, addresses, any memoranda or statements of all eyewitnesses in the possession of the prosecution relating to all the crimes charged and who could give evidence on the various charges but had not testified at the preliminary examination. Following discussion between court and counsel, the court viewed the motion as extremely broad by reason of the many crimes charged, the various law-enforcement agencies involved, and the numerous witnesses who might be called, and so granted the motion in part and denied it in part, ordering that the defense should

be furnished the statements of persons who would be called as witnesses, statements of witnesses at the preliminary, and copies of all police reports of all crimes charged in the information or to which the deputy district attorney had alluded in the opening statement. The court stated that the order was broad in its terms but if any specific situation arose that was not covered therein, then counsel could bring it to the court's attention for a specific ruling. Appellant's counsel made no objection to such ruling and did not bring any specific situations to the court's attention for ruling nor indicate that the material furnished him under the court's order was not sufficient for his investigative purposes. Obviously, a large amount of material was involved in the ramifications of the charges against appellant and the court indicated its willingness in its discretion to broaden its order if the defense thought any specific situation called for special treatment, so as to satisfy the needs of the defense and at the same time not overtax the prosecution.

Appellant's motion was simply couched in language indicating he wanted to learn the facts, a ''blanket request that the prosecution turn over to defense counsel all the statements which it had,'' showing no ''better cause for inspection than a mere desire for the benefit of all information which ha[d] been obtained by the People in their investigation of the crime.'' (*People* v. *Cooper*, 53 Cal.2d 755, 770 [349 P.2d 964].) The court's order in response to appellant's motion rested largely in its exercise of a sound discretion (*Vetter* v. *Superior Court*, 189 Cal.App.2d 132, 134 [10 Cal.Rptr. 890]), and it was willing to consider further requests for specific rulings as appellant's counsel might deem appropriate to make as the trial progressed. (*People* v. *Mitman*, 184 Cal. App.2d 685, 691 [7 Cal.Rptr. 712]; *People* v. *Gallegos*, 180 Cal.App.2d 274, 277 [4 Cal. Rptr. 413].)

7. *The deputy district attorneys were guilty of prejudicial misconduct.*

 Appellant lists many instances of claimed misconduct. Some of them (e.g., the characterization of the appellant as an ''animal''; as one of the most ''vicious gunmen and killers''; and as one whose attack is ''on you and your families and all other persons in the community'') fall properly under the rule that prosecuting attorneys are allowed a wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence. (*People* v. *Wein*,

50 Cal.2d 383, 396 [326 P.2d 457]; *People* v. *Glaze*, 139 Cal. 154, 159 [72 P. 965]; *People* v. *Patterson*, 118 Cal.App.2d 45, 48 [256 P.2d 992]; *People* v. *Cannizzaro*, 138 Cal.App. 28, 32 [31 P.2d 1066].) ▮ Others (e.g., that the jury should either find appellant guilty of murder in the first degree or turn him loose; that appellant's carrying the gun on the day of the killing was an indication of intent to kill if appellant got cornered) amounted to no more than the argument of legitimate inferences which the prosecutor might properly argue from the evidence.

▮ The production of appellant's alleged coconspirators, who were not defendants in the case, in the courtroom for purposes of identification by various witnesses as participants in the several robberies testified to was a proper procedure in the orderly presentation of the People's case. In the testimony of the several witnesses to distinct occurrences in which these persons were participants, their identification by the witnesses was necessary to establish that the same persons were being referred to by the different witnesses. The difficulty of establishing this fact by the oral testimony of the witnesses who were not personally acquainted with these participants in the robberies is too obvious to require further comment. Additionally, no objection was made by counsel for appellant to this procedure.

▮ It was not improper for the prosecutor to state to the jury that he was paid to make decisions such as the one to permit Wilson to plead guilty to two counts and to dismiss the other counts so that Wilson might become a witness; and the further statement that "we gave [Wilson] something to make him testify" was no more than a colloquial way of referring to the dismissal of the charges in order that Wilson might become a witness under Penal Code section 1099. We cannot see how appellant could have been prejudiced by this frank admission of the practical effect of a dismissal under that section. ▮ The statement that Wilson had more to fear for his life by testifying than if he had continued in the trial for murder had a foundation in Wilson's testimony that appellant had threatened to "take" Wilson "with him" if Wilson became a witness against him, and we cannot say that it exceeded the bounds of legitimate argument.

▮ A reference was made in argument to two police officers who got in trouble in Long Beach. Such comments should be avoided under the settled rule that facts not in

evidence should not be referred to in argument, but we can find no prejudice to appellant in this particular incident.

The argument was made that since appellant had been previously convicted of robbery and robbery is stealing: "It also involves this concept of honesty, so that a thief and a liar are generally the same thing. You show me a thief and I will show you a liar, because it involves this concept of honesty." Code of Civil Procedure section 2051 provides, so far as here material: "A witness may be impeached . . . by evidence that his general reputation for truth, honesty, or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony. . . ." Under this section it is well settled that "[t]he nature of the crime of which he was convicted is a proper subject of inquiry in establishing the fact of his conviction." (*People* v. *Williams*, 27 Cal.2d 220, 228 [163 P.2d 692]; see also *People* v. *David*, 12 Cal.2d 639, 646 [86 P.2d 811]; *People* v. *Craig*, 196 Cal. 19, 28 [235 P. 721]; *People* v. *Eldridge*, 147 Cal. 782, 786 [82 P. 442]; *People* v. *Chin Hane*, 108 Cal. 597, 607 [41 P. 697].) The language of section 2051 above quoted makes it clear that while generally evidence of "particular wrongful acts" may not be admitted for impeachment purposes, evidence of such "particular wrongful acts" as are judicially established by convictions of felonies may be admitted for that purpose by proof of such convictions. Counsel cite no authority upon the question here presented as to the right to argue the nature of the particular felony of which a witness has been convicted as relating to its weight for the purpose of impeachment, but in view of the settled rule that the nature of the felony may be established as a part of the impeachment, we can see no reason why reasonable argument of this sort should not be permitted.

A few other specifications of misconduct are presented but from an examination of the record, we are satisfied that they concern matters of trivial importance and could not have resulted in prejudice to appellant.

8. *There was error in the instructions.*

1. The court gave the usual instructions on the presumption of innocence and also gave the statutory definition of malice (Pen. Code, § 188) as a presumption of guilt of murder. Appellant argues that these opposing instructions

would confuse the jury in applying the presumptions in the determination of appellant's guilt.

The propriety of giving the instruction on the presumption of innocence along with the standard instruction on malice was recognized and discussed in *People* v. *Graham, supra,* 191 Cal.App.2d 521, 530-532, consistent with the prosecution's full reliance on the introduction of evidence rather than on any presumption to show appellant's malice.

2. The court instructed the jury that a killing in the commission of a robbery or to prevent an arrest for such an offense, with intent to so evade arrest, was "wilful, deliberate and premeditated" and "murder of the first degree." Appellant argues such instruction was improper because no account was taken of the remoteness of the time element, and the jury might have understood that a robbery committed by a person many years prior to a subsequent killing might still be the basis for holding the homicide murder of the first degree.

The jury could not reasonably have been misled on any time element in connection with commission of the robberies and the subsequent killing with intent to evade arrest therefor. The instruction itself applied only to one who "does intentionally shoot and kill a police officer with the intent of thereby evading being arrested for the commission of said robberies"; and the jury was fully instructed on the time necessary to formulate such an intent.

3. The court failed to give a cautionary instruction on admissions; such instruction must be given without request. (*People* v. *Deloney,* 41 Cal.2d 832, 840 [264 P.2d 532]; see also *People* v. *Riley,* 35 Cal.2d 279, 286 [217 P.2d 625].)

No cautionary instruction was necessary. The so-called admission referred to in appellant's brief was a prison guard's testimony that as appellant and some other prisoners were being returned in a transportation bus from the Long Beach court, he saw appellant laugh and say "I have been offered seven medals already." Appellant later took the stand and admitted that he had made this statement. However, appellant claimed that the guard misinterpreted the import of the words; that appellant had been telling his fellow-prisoners a lengthy story of police brutality and that one of the prisoners said that he should get a medal for his beating and appellant responded he had been offered several already. There was no dispute about the words having been uttered by appellant but only as to their implication. A cautionary

instruction properly is required where there is danger of misinterpretation of a defendant's words but not as to the meaning or inference that the jury is entitled to draw from them if there is no dispute about the words themselves. (*Frank Meline Co.* v. *Kleinberger,* 108 Cal.App. 60, 62-63 [290 P. 1042].) The deputy district attorney in closing argument referred to the fact of appellant's laughing when he made the statement as showing a lack of remorse, premeditation rather than accident. Laughter would seem to be conduct rather than an oral admission, and so not covered by a cautionary instruction. Appellant did not request such instruction, and the failure to give the instruction, even if error, does not necessarily lead to prejudice where there is a strong case against the defendant. (*People* v. *Carswell,* 51 Cal.2d 602, 608 [335 P.2d 99]; *People* v. *Riley, supra,* 35 Cal.2d 279, 286; *People* v. *Griffin,* 162 Cal.App.2d 712, 717 [328 P.2d 502].)

We are satisfied that no prejudicial error occurred on the trial of the issue of guilt.

At the trial on the penalty, however, three types of error and misconduct occurred, the cumulative effect of which must be held to have operated to the prejudice of appellant.

1. At the opening of the trial on the penalty the prosecution produced as its first witness a telegraph-office employee who identified a telegram as one sent to the witness Wilson by Mrs. Poulopoulos. Mrs. Poulopoulos was the wife of the brother of appellant's wife. She had been a constant spectator during appellant's trial and had seen Wilson daily in the courtroom. The telegram read: "Does your cigarette taste different, lately? Switch from hots to Kools," and was signed: "Lucky." Over the objection that the telegram had not been connected in any way to appellant it was admitted in evidence. On his argument the prosecuting attorney argued that this telegram "can certainly be construed as a threat or an admonition to (Wilson) to keep his mouth shut." Wilson had testified to a threat made to him by appellant if he should become a witness. The prosecuting attorney argued further that the sending of the telegram "corroborates Wilson's story about 'If you get any ideas about talking, I will take you with me' " (the alleged threat by appellant to Wilson); and he drew the conclusion: "This is a cunning, cruel individual. regardless of how many tears he sheds."

 While evidence of efforts by a defendant himself to prevent a witness from testifying are admissible against him,

in order to make evidence of such efforts by another person admissible it must be established that this was done by the authorization of the defendant. (*People* v. *Weiss,* 50 Cal.2d 535, 553-554 [327 P.2d 527]; *People* v. *Perez,* 169 Cal.App.2d 473, 477-478 [337 P.2d 539]; *People* v. *Gilliland,* 39 Cal.App. 2d 250, 255-257 [103 P.2d 179]; see *People* v. *Golden,* 55 Cal.2d 358, 370 [11 Cal.Rptr. 80, 359 P.2d 448].)

The Attorney General, while recognizing this rule, points out that the defendant's authorization of the third person's conduct in attempting to influence a witness may be proved by circumstantial evidence. (*People* v. *Kendall,* 111 Cal.App. 2d 204, 213-214 [244 P.2d 418]; *People* v. *Moore,* 70 Cal.App. 2d 158, 163 [160 P.2d 857]; *People* v. *Burke,* 18 Cal.App. 72, 91-93 [122 P. 435].) The Attorney General (quoting from his brief) sets out the following circumstantial evidence as that on which he relies: "In the present case we have the fact that the telegram was sent, the fact that the sender was related to appellant, and took a deep personal interest in him, saw him frequently before and after, yet did not know Wilson. This would seem sufficient to justify an inference of authorization by appellant."

 The sending of the telegram obviously proves nothing as to its authorization. The relationship of the sender to and her personal interest in appellant are no proof of authorization. Relationship to the defendant does not prove authorization (*People* v. *Golden, supra,* 55 Cal.2d at p. 370; *People* v. *Perez, supra,* 169 Cal.App.2d at p. 478) and the interest of the third person in the defendant clearly stands on no higher ground. The fact that Mrs. Poulopoulos did not know Wilson personally has no value as circumstantial evidence of authorization since admittedly she had seen him daily during the trial, and from that fact knew his name and his connection with the case. The remaining factor, that Mrs. Poulopoulos had visited appellant before and after the telegram was sent proves only that appellant had the opportunity to authorize the sending of the telegram but has no value as circumstantial evidence to prove that he in fact did so. No rule is better settled than the one that "[m]ere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof" (*People* v. *Bender,* 27 Cal.2d 164, 186 [163 P.2d 8]) and proof of mere opportunity to do an act is no proof that the act was in fact done. It can do no more than create a conjecture, surmise or suspicion that the act may have, because it could have, been done. The life of

even the most hardened criminal should not be staked on such a flimsy foundation.

2. The prosecuting attorney argued that the authorities are forced to parole prisoners because not enough prison space is provided for all of the felons who are convicted in California. "It is like a pipe. You have got it full and you want to put a bean in one end. One bean has got to come out the other. . . . We send a man up to the penitentiary. They need a bed for him. One man has got to come out, whether he is ready or not." While this argument was based on facts not in evidence, and hence improper under the rule that it is misconduct to argue facts not in evidence (cases cited *infra*), since no objection was made to it, we refer to it only as prelude to the argument of specific facts not in evidence, to which objection was made, and which were stated in support of this general argument. The prosecuting attorney followed this general argument with the following: "Mr. Duncan (counsel for appellant) didn't tell you about . . . the eight cases we have got in the State of California of paroled first-degree murderers who repeated when they got out.

"Then he didn't tell you about this Coors' case, where the guy who killed this Mr. Coors up in Colorado, is an escapee doing life on murder. . . ."

"MR. DUNCAN: Your Honor, I am going to move to cite the District Attorney for misconduct in regards to the statements on the eight repeats and the reference to the Coors matter and the man that apparently is accused of that crime.

"THE COURT: If that is an objection, it is overruled and the motion is denied.

"MR. DUNCAN: I would request the court to admonish the jury.

"THE COURT: The request is denied."

 The objection was clearly proper under the well settled rule that it is misconduct for the prosecutor to refer to facts not in evidence in his argument to the jury. (*People* v. *Love,* 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Kirkes,* 39 Cal.2d 719, 724 [249 P.2d 1]; *People* v. *Evans,* 39 Cal.2d 242, 251 [246 P.2d 636].)

 While the objection was not made specifically on that ground it has been held, even in civil cases, that if evidence is inadmissible for any purpose a general objection to its admissibility is sufficient. (*Scott* v. *Times-Mirror Co.,* 181 Cal. 345, 357 [184 P. 672, 12 A.L.R. 1007]; *Short* v. *Frink,* 151 Cal. 83, 86 [90 P. 200]; *Roche* v. *Llewellyn Iron Works Co.,*

140 Cal. 563, 577 [74 P. 147]; *Morehouse* v. *Morehouse,* 140 Cal. 88, 93-94 [72 P. 738].) ▪▪▪ As stated in the *Times-Mirror* case, *supra,* 181 Cal. at page 357: "It has been held that the general objection . . . is sufficient in all cases in which the specific grounds of objection, if stated, could not be obviated." ▪▪▪ The reasoning of these cases fits the instant objection since under no circumstances is the prosecutor entitled to argue facts not in evidence and no matter how specific the objection, the grounds thereof could not have been obviated. Following this the prosecutor argued at length the case of the "guy here in Long Beach that raped this little 3-year-old. . . . He tore her up so bad it took four hours of surgery to put her back together again. I tried him. He went up to this same Atascadero where Terry went. He was back in a year and a half fully cured, according to them. They said, 'Put him on probation.'

"Judge Maltby . . . says to the psychiatrist, 'How can I do that. . . .? He is ineligible for probation. The law won't permit it.'

" 'Oh,' the psychiatrist says, 'then send him back to us as presently insane.'

" 'How can I do that?' the judge says, 'The report says he is sane.'

"The psychiatrist says, 'Oh, that report was written a month ago. He was sane then. He may be insane now.'

"From month to month they couldn't tell whether he was sane, insane, or what-have you. . . . These are the people that they want you to trust on whether Terry gets back on the street or not. . . .

"I know I had one here that shot it out with them one time. He didn't kill one. He shot it out with them on armed robbery. Ten to life he got. Ten to life, in 1947. In 1951 I was right in this courtroom trying him again for another armed robbery. In four years he was back on the street and he had been sent up for a ten to life sentence."

▪▪▪ While no objection was made to this last-quoted argument, it followed immediately upon the argument of specific facts not in evidence to which objection was made and overruled, and properly falls under the rule that once objection to a class of evidence or argument is made and overruled, there is no necessity to repeat the same objection when other evidence or argument of the same class is offered or made. (*Wilcox* v. *Sway,* 69 Cal.App.2d 560, 570 [160 P.2d 154];

*Moore* v. *Norwood*, 41 Cal.App.2d 359, 368-369 [106 P.2d 939].)

 As to all of this argument, which was highly inflammatory, we are likewise satisfied that no admonition of the judge could have cured its effect on the jury (*People* v. *Love, supra*, 56 Cal.2d at p. 732; *People* v. *Kirkes, supra*, 39 Cal.2d at p. 726), nor is it any justification for making argument of this character that it is in answer to argument made by counsel for the defense (*People* v. *Kirkes, supra*, 39 Cal.2d at pp. 725-726; *People* v. *Sampsell*, 34 Cal.2d 757, 765 [214 P.2d 813]).

3. The prosecuting attorney argued the greater deterrent effect of the death penalty and supported his argument by the recitation of facts not in evidence of the same character as those held prejudicially erroneous in *People* v. *Love, supra*, 56 Cal.2d 720, 730-733.

 The jury has an absolute discretion in determining whether the punishment shall be fixed at life imprisonment or death and for that reason, as pointed out in *People* v. *Linden*, 52 Cal.2d 1, 27 [338 P.2d 397], and reiterated in *People* v. *Love, supra*, 56 Cal.2d at page 733, "error tending to affect the jury's attitude in fixing the penalty 'implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision [art. VI, § 4½] save the verdict.'" Having in mind the cumulative effect of the several matters herein discussed upon the minds of the jurors, we are forced to the conclusion, despite the heinousness of the crime, that their total effect was to deprive appellant of the fair trial on the issue of penalty to which he was entitled, and they must be held to have constituted prejudicial error. In view of this conclusion other claimed errors in the penalty trial need not be noticed.

The judgment is reversed only insofar as it relates to the penalty for the offense of first degree murder. In all other respects the judgment is affirmed.

Gibson, C. J., Traynor, J., and Peters, J., concurred.

WHITE, J., Concurring and Dissenting.—I concur in that portion of the opinion which affirms the judgment of conviction of murder of the first degree, but dissent from the reversal of the judgment insofar as it relates to the penalty for the offense of first degree murder.

Assuming that the court erred in its ruling admitting into evidence the telegram sent by Mrs. Poulopoulos to the witness Wilson and that the statements of the deputy district attorney to the jury exceeded the bounds of legitimate argument. I am persuaded from a reading of the record in this case that it comes within the purview of the language in *People* v. *Linden,* 52 Cal.2d 1, 27 [338 P.2d 397] and reiterated in *People* v. *Love,* 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal. Rptr. 481, 366 P.2d 33, 809] at page 731, that while error tending to affect the jury's attitude in fixing the penalty ''implicitly invites reversal in every case,'' that ''under extraordinary circumstances'' the constitutional provisions (art. VI, § 4½) may come to the rescue of the verdict.

The majority opinion refers to the crime with which we are concerned as a ''heinous'' one. Indeed it was, and a cruel and brutal one as well.

As stated in the majority opinion the two officers driving a police car noticed ''. . . two cars, one a black 1950 Cadillac and the other a maroon 1950 Chrysler, each with a single occupant, the driver, move out of a parking lot and turn onto Seaside Boulevard. About 10 minutes later the two officers proceeded down Seaside Boulevard and saw the same two cars standing on the side of the road. A Ford was parked in front of the Cadillac. Observing that the hood on the Cadillac was raised and that [defendant] Wilson was looking into the engine, *the two officers stopped to give assistance.''* (Emphasis added.) While Officer Owings was inquiring of Wilson as to what was the difficulty with the latter's vehicle, Terry (appellant herein) shot and mortally wounded Officer Owings, and then turned his gun on Officer Brizendine, shooting the latter in the leg. Defendant Terry continued shooting at Officer Brizendine in an effort to kill him also, until the former's supply of ammunition was exhausted. Thereupon defendant Terry ran to the Chrysler and as stated in the majority opinion, ''got into the driver's seat, and with [defendant] Wilson beside him, backed out the car, *driving over Owings fallen body,* and sped down Seaside Boulevard.''* (Emphasis added.) All this evidence of savagery, unusual cruelty and immeasurable depravity was before the jury on the penalty hearing, as was evidence of defendant Terry's prior convictions of moral offenses, to wit: Penal Code section 288 (Crimes against children: Lewd or lascivious acts) and section 286 of the Penal Code (The infamous crime against nature). To me

it seems manifest that these evidentiary features of the cause now engaging our attention strictures this case as one possessing the "extraordinary circumstances" referred to in *People* v. *Love, supra,* 56 Cal.2d 720, 733 and *People* v. *Linden, supra,* 52 Cal.2d 1, 27 under which the constitutional provision (art. VI, § 4½) can "save the verdict."

The constitutional provision just referred to was adopted by the People of this state and stands as a declaration by them of public policy under which as therein declared: "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, *the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.*" (Emphasis added.) Manifestly, the policy of the constitutional provision is to disregard errors which would not change the result of trial unless they prejudice constitutional rights. However, in *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243], after a review of certain fundamental rights guaranteed to an accused as contrasted with other rights, this court said: ". . . not every invasion of a constitutional right necessarily requires a reversal; that generally, error involving the infringement of a constitutional right, like any other error, requires a further determination whether the defendant has been prejudiced, and the final test is the 'opinion' of the reviewing court, in the sense of its belief or conviction, as to the effect of the error; and that ordinarily *where the result appears just, and it further appears that such result would have been reached if the error had not been committed, a reversal will not be ordered.*" (Emphasis added.)

I cannot reconcile my conscience " 'after an examination of the entire cause, including the evidence' . . . that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People* v. *Watson, supra,* 46 Cal.2d at p. 836) when, as was further stated in the *Watson* case just cited at page 837, "Nevertheless, the test . . . must necessarily be based upon *reasonable probabilities* rather than upon *mere possibilities;* otherwise the entire purpose of the constitutional provision would be defeated." (Emphasis added.)

For the foregoing reasons, I would affirm the judgment

both as to the conviction of murder of the first degree and the penalty imposed by the jury.

SCHAUER, J., Concurring and Dissenting.—With Justice White I concur in the majority's affirmance of the judgment adjudicating defendant's guilt of murder in the first degree and I also concur in Justice White's dissent from the reversal of the judgment insofar as it relates to the penalty for the offense.

Even if I assume for purposes of the opinion that under the present state of decisional law (which appears to me to be demonstrably unrealistic; see *People* v. *Love* (1961) 56 Cal. 2d 720, 731-733 [21-27], 734, 739 [16 Cal.Rptr. 777, 17 Cal. Rptr. 481, 366 P.2d 33, 809]; *People* v. *Love* (1961), *ante,* p. 748 [17 Cal.Rptr. 481, 366 P.2d 809]; *People* v. *Kidd* (1961) 56 Cal.2d 759, 771 [16 Cal.Rptr. 793, 366 P.2d 49]) the majority are correct in holding that the trial court erred in three respects[1] during the proceeding to determine penalty, I find no legitimate basis for reversal of the judgment. The errors related by the majority, whether considered singly or in combination are so trivial when viewed against the overwhelming abundance of proof of defendant's guilt,

---

[1]The asserted errors are:

1. As to admission of evidence: The receipt in evidence of a telegram sent during the trial to the state's witness Wilson (who had been defendant's companion on the day defendant murdered Police Officer Vernon J. Owings) by the wife of the brother of defendant's wife, reading: ''Does your cigarette taste different, lately? Switch from hots to Kools,'' and signed: ''Lucky.''

2. As to illustrating argument by reference to matters of public record or general knowledge: The prosecutor ''argued that the authorities are forced to parole prisoners because not enough prison space is provided for all of the felons who are convicted in California.'' In his argument he also mentioned ''eight cases we have got in . . . California of paroled first-degree murderers who repeated when they got out'' and stated that the defendant's counsel when arguing ''didn't tell you about this Coors' case, where the guy who killed this Mr. Coors up in Colorado, is an escapee doing life on murder. . . .'' The majority further relate the prosecuting attorney's reference to an asserted conversation between a judge and a psychiatrist concerning a man who had raped a ''little 3-year old,'' and to an earlier case he had tried. Of the earlier-case defendant, the prosecutor said ''Ten to life, in 1947. In 1951 I was right in this courtroom trying him again for another armed robbery.''

3. As to arguing the deterrent effect of the death penalty: The majority opinion states that ''The prosecuting attorney argued the greater deterrent effect of the death penalty and supported his argument by the recitation of facts [seemingly all matters of public record or general knowledge] not in evidence of the same character as those held prejudicially erroneous in *People* v. *Love* [1961], *supra,* 56 Cal.2d 720, 730-733.''

and of his character as demonstrated by his sustained course of conduct and the nature of his crimes, as to make the assumed errors *de minimis.*

The majority refer to their decision in *People* v. *Love, supra,* wherein they stated (p. 731 of 56 Cal.2d) that "it is not a matter of common knowledge that capital punishment is or is not a more effective deterrent than imprisonment," and hold that the prosecuting attorney erred in suggesting to the jury that the death penalty would have been a more effective deterrent than so-called life imprisonment proved to be in certain cases which he mentioned by way of illustration, and which are more particularly described in the margin here (fn. 1) as well as in the majority opinion. As for myself, I am quite convinced that if, for example, the person mentioned by the prosecutor as having been sentenced "Ten to life" in 1947, and as being back on trial for a similar offense in 1951, had on the first occasion received the death sentence and been executed, he would have been so deterred that he would not have been back again for a similar offense four years later. Yet, the majority insist it is reversible error to argue to a jury that a man who has been executed is more effectively deterred from further crimes than a man who has been imprisoned and paroled.

As pointed out by Justice White, this court is under constitutional mandate not to reverse a judgment "for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. [Amendment adopted November 3, 1914.]" (Cal. Const., art. VI, § 4½.)

In the record before us I find no basis whatsoever for an objective conclusion that any error or combination of errors has resulted in a miscarriage of justice. Accordingly, obedient to the mandate of our Constitution, I would affirm the judgment in its entirety.

McComb, J., concurred.

The petitions of the respondent and of the appellant for a rehearing were denied May 16, 1962. Schauer, J., McComb, J., and White, J., were of the opinion that the petition of plaintiff and respondent should be granted and that the petition of defendant and appellant should be denied.